In re the HAWAII CORPORATION, Debtor.

BANK OF HONOLULU, Creditor-Appellant,

v.

The HAWAII CORPORATION, and John T. Goss, Trustee for the Estate of the Hawaii Corporation, Defendant-Appellee.

No. 86–2746.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 11, 1987.

Decided Oct. 2, 1987.

George L.T. Kerr and Gregory P. Conlan, Honolulu, Hawaii, for creditor-appellant.

Don Jeffrey Gelber and Robert J. Faris, Honolulu, Hawaii, for debtor, defendant-appellee.

John J. Gill, III and Thomas J. Greco, Washington, D.C., for amicus curiae American Bankers Assn. and Hawaii Bankers Ass'n.

Before NORRIS and NOONAN, Circuit Judges, and STEPHENS,[*] District Judge.

NOONAN, Circuit Judge:

Bank of Honolulu (the Bank) appeals from an order of the district court sustaining an objection to proof of stock in the reorganization of The Hawaii Corporation (the Company). The district court had jurisdiction under 28 U.S.C. § 1334; jurisdiction in this court exists under 28 U.S.C. § 1291 because the district court's order qualifies as a final collateral order meeting the criteria set by *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); *Matter of Hawaii Corp.*, 796 F.2d 1139 (9th Cir.1986). The case presents a classic conflict, between a lender holding collateral and another party with some claim to the same collateral. We reverse and remand for entry of judgment in favor of the Bank.

## FACTS

In 1974 Randolph Crossley, a director and officer of the Company, borrowed a total of $79,875.50 from the Bank to buy the Company's stock. He pledged the stock—a total of 20,769 shares—to the Bank as collateral, and the Bank took possession of his certificates. In 1977 Crossley defaulted on the loans; the Bank brought suit; the suit was ended in a settlement on September 14, 1977, reaffirming the Bank's right to possession of the pledged stock.

Meanwhile, in 1976, the Company had entered bankruptcy. In 1978 John T. Goss, the trustee in bankruptcy (the Trustee) brought suit against Crossley and other former directors for malfeasance and misfeasance. The creditors of the Company sued the same parties. On October 26, 1979 both actions were settled. By the terms of this settlement the officers and directors, including Crossley, signed general releases by which they released all

* Honorable Albert Lee Stephens, Jr., Senior United States District Judge, Central District of California, sitting by designation.

"claims, demands, causes of action, or interests" against or in the Company.

On August 28, 1980 the district court, reviewing the Trustee's plan of reorganization, found the Company to be insolvent and its stock without value. Subsequently, the Trustee's management of the assets generated enough cash to pay all creditors in full and to pay a liquidating dividend to the stockholders. In January 1984 the Bank presented to the Trustee certificates for the 20,769 shares in order to qualify for this dividend. The Trustee objected on the ground that the general release of October 26, 1979 had released all of Crossley's interest in the Company. On June 3, 1986 the district court sustained the Trustee's objection. The Bank appealed.

## ANALYSIS

The Trustee relies on the literal language of UCC § 8–207(1), Haw.Rev.Stat. 490:8–207(1):

Prior to due presentment for registration of transfer of a security in registered form the issuer or indenture trustee may treat the registered owner as the person exclusively entitled to vote, to receive notifications and otherwise to exercise all the rights and powers of an owner.

Crossley was the registered owner; the Bank never registered the stock. The case, therefore, is simple, says the Trustee. The company had the absolute right to deal with Crossley as the owner. Crossley, exercising all the rights and powers of an owner, released his interest. The Bank has nothing.

█ While this straightforward interpretation of UCC § 8–207 has a good deal of appeal when this statute is considered by itself, it is not appropriate to interpret the Uniform Commercial Code without consideration of other sections and the Code's general thrust. In particular, UCC § 8–105 declares: "Securities governed by this Article are negotiable instruments." A standard commentary repeats this sentence and adds: "The overriding objective of Article 8 is to confer negotiability upon securities governed by that Article." Anderson *Uniform Commercial Code*, (1985) § 8–105:4. Negotiability means that the transferee takes the rights of the transferor. UCC § 8–301(1), Haw.Rev.Stat. § 490:8–301(1). Negotiability is negated when the transferor retains rights which, if exercised even fraudulently, will frustrate the exercise of rights by the transferee.

In addition to undermining the purpose of Article 8, the Trustee's position runs counter to UCC § 8–105(2)(c), Haw.Rev. Stat. § 490:8–105(2)(c):

In any action on a security ... [w]hen signatures are admitted or established production of the instrument entitles a holder to recover on it unless the defendant establishes a defense or a defect going to the validity of the security....

The Trustee argues that the last part of this statute is to be read disjunctively so the section means the defendant wins either if it establishes a defect going to the validity of the security or if the defendant establishes a defense. This reading does not make a great deal of sense. To say that the defendant wins if it establishes a defense without qualification deprives the statute of its obvious purpose of enhancing negotiability. Indeed the last words of the statute referring to a defect do not even seem necessary in this interpretation. The statute makes more sense if it is read to say that the defendant wins only if it establishes either a defense or a defect which goes to the validity of the security.

█ A third difficulty with the Trustee's position is the UCC's treatment of an issuer's lien. An issuer's lien—a more substantial claim than the general release involved here—is valid against a purchaser of a security only if the lien is "noted conspicuously" on the certificate. UCC § 8–103(a); Haw.Rev.Stat. § 490:8–103. If the issuer may not at the inception of its relation with the registered owner create a secret right in its own favor, much less may the issuer do so after the owner has used his certificates to obtain credit from a lender.

█ A fourth and convergent objection to the Trustee's position comes from the nature of the security interest created by

Crossley when he transferred his certificates to the Bank. The Bank's security interest was superior to the interest of that of other creditors of Crossley. A security interest in collateral in the possession of the secured party and for which the secured party has given value is enforceable against any third party. UCC § 9–203, Haw.Rev.Stat. § 490:9–203. The Bank's interest was then prior to that of other creditors of Crossley. The Company's claim was no more than that of a later creditor. Crossley had no interest in the certificates that he could transfer to the Company by his general release. Indeed, although the Trustee claims he did, he may not even have attempted to make a transfer of such an interest. By the general release that he executed he gave up whatever interest of any kind he had. But he could not give up an interest he had already transferred to the Bank.

That § 8–207 is not to be understood with the literalness for which the Trustee contends is confirmed by UCC § 8–405, Haw.Rev.Stat. § 490:8–405, dealing with lost, destroyed or stolen securities. Under this provision if the registered owner sells his stock to a bona fide purchaser and then presents a claim to the issuer that the stock is lost, the issuer is protected in issuing a new security to the registered owner *only* if the issuer does not have notice of the certificates' acquisition by the bona fide purchaser. Further, even if the issuer proceeds to issue a new security without notice of the bona fide purchaser, the issuer must register the old certificates when a bona fide purchaser presents them. The issuer is then left to recover his loss from the original registrant. In short, the risk of loss is put on the issuer and the complete protection that § 8–207 appears to offer, if read literally, is not recognized by the Uniform Commercial Code.

From this consideration of the parts of this complex and interrelated statutory scheme it is apparent that § 8–207 is meant to apply in what could be called the normal case—the exercise of voting rights and the payment of dividends in the normal course of business. It was never meant to give

the issuer an advantage over a bona fide purchaser. It was never meant to give the issuer a way of subverting a perfected security interest. It was never meant to impair the negotiability of stock certificates. The very purpose of Article 8 of the UCC was to give "bona fide purchasers of securities greater rights than those they would have if the things bought were chattels or simple contracts." Official Code Comment, UCC § 8–105.1. The holder of a security as collateral should not have lesser rights than a pledgee of a chattel.

The Trustee presses upon us as precedent *New England Merchants National Bank v. Old Colony Trust Co.*, 385 Mass. 24, 429 N.E.2d 1143 (1982); but there the issuer in good faith had paid a liquidating dividend to a registered owner who had claimed to have lost his certificates and had obtained replacements; the missing certificates turned up later in the hands of an estate which tried to get the same liquidating dividend but failed to prove that value had been given for the certificates. The estate was not a bona fide purchaser. The estate did not hold a perfected security interest. The case is far from the one at hand.

Our conclusion that the Bank prevails is in accord with what the American Bankers Association, the Consumer Bankers Association and the Hawaii Bankers Association urge as sound commercial practice—not to impose upon banks the duty of registering stock and the burdens of a registered owner. While at some future date stock certificates may pass from the scene, they are now a common form of collateral. To increase the difficulty of using such collateral, to increase the expense of loans where such collateral is pledged, would be to run contrary to commercial usage. A fundamental purpose of the Uniform Commercial Code is "to permit the continued expansion of commercial practices through custom, usage, and agreement of the parties." UCC § 1–102, Haw.Rev.Stat. § 490:1–102. It would be counter to this purpose, as it would be counter to the overriding objective of Article 8, to accept the Trustee's argument and limit the ease

with which certificates can be made negotiable collateral.

REVERSED AND REMANDED with instructions to enter judgment for the Bank.